Christopher Sproul (Cal Bar. No. 126398)
Brian Orion (Cal Bar. No. 239460)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, CA 94121
Telephone:  (415) 533-3376
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email: borion@enviroadvocates.com

Hans W. Herb (Cal Bar No. 136318)
LAW OFFICE OF HANS W. HERB
P.O. Box 970
Santa Rosa, CA  95402
Telephone:  (707) 576-0757
Email:  hans@tankman.com

Xhavin Sinha  (Cal Bar No. 309340)
SINHA LAW
2445 Augustine Drive, Suite 150
Santa Clara, CA 95054
Telephone:  (408) 791-0432
Email:  xsinha@sinha-law.com

Attorneys for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>    vs.<br><br>CALIFORNIA CASCADE BUILDING MATERIALS, INC., a Delaware corporation; AMAR S. DOMAN, an individual; JAMES CODE, an individual; and JACOB BURNS, an individual,<br><br>        Defendants. | Case No.:  2:19-cv-01936 TLN KJN<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.) |

FIRST AMENDED COMPLAINT – Page 1

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

**INTRODUCTION**

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about July 18, 2019, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Water Board") and (4) to Defendants, including a copy delivered to the Facility Manager of Defendant California Cascade Building Materials, Inc., by certified mail, at 7512 14th Avenue, Sacramento, California ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      On September 23, 2019, EDEN filed its Complaint for Injunctive and Declaratory Relief, Civil Penalties and Remediation (Dkt. #1) against the Defendants. On or about September 27, 2019, EDEN provided a First Supplemental Amended Notice ("Notice") of Defendants' violations to Defendants and the EPA and the State Water Board.  A copy of EDEN's First Supplemental Amended Notice of Intent to Sue is attached hereto as Exhibit "A" and incorporated herein by reference.

4.      More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National

EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

**JURISDICTION/VENUE**

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6. The permit pertinent to this case (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001) (the "General Permit"), is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)).

7. By its express language, a violation of the General Permit constitutes a *per se* violation of the Federal Clean Water Act.  (General Permit, Section XXI.A)

8. Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

**PARTIES**

9.    Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018.  EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

10.    EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.   Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and the General Permit by seeking redress from environmental harms caused by industrial dischargers who pollute the waters of the United States, through community education and citizen suit enforcement when necessary.

11.    EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

12.    EDEN has members throughout California.  Some of EDEN's members reside and work near Morrison Creek and the Sacramento River (the "Receiving Waters" for Defendant California Cascade Building Materials' Facility storm water run-off), and use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the General Permit and the CWA.

13.    EDEN has standing as an association to bring this suit against Defendants, as at least three of EDEN's current members are experiencing ongoing and continuing harm particular

FIRST AMENDED COMPLAINT – Page 4

to him or her as a specific result of Defendants' violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility and has experienced such harm since at least the date that EDEN provided to Defendants a 60-day Notice of Intent to Sue. For example, one of EDEN's members lives in Sacramento and regularly uses the Sacramento River for aesthetic and recreational purposes. This member has gone swimming in the Sacramento River in the area around Discovery Park, has gone fishing in the Sacramento River in the area around Natomas, enjoys walking along the Sacramento River (and viewing wildlife in connection therewith), and intends to do each of these activities again in the future. This member is familiar with the Facility and has visited the Facility to investigate its potential for discharging pollutants to nearby waterways. This member is aware that the Facility discharges pollutants to the Sacramento River and is saddened to know of this. This member's use and enjoyment is lessened due to this member's knowledge that the Facility is discharging pollutants to the Sacramento River in the absence of compliance with the Clean Water Act.

14. As such, the aesthetic and recreational interests of the individual members of EDEN with standing have been diminished, limited and harmed specifically from Defendants' violations of the CWA, due to the pollution caused by Defendants' environmental violations that EDEN's members believe has entered into the Facility's Receiving Waters.

15. Defendants' ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy. The relief requested will redress the ongoing injury in fact to EDEN and its members. Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

16.    EDEN is informed and believes, and on such information and belief alleges, that Defendant CALIFORNIA CASCADE BUILDING MATERIALS, INC. ("California Cascade Building Materials"), located at 7512 14th Avenue, in Sacramento, California, is a Delaware corporation, which was registered to do business in California on or about July 6, 2015. California Cascade Building Materials is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the Facility.

17.    EDEN is informed and believes, and on such information and belief alleges that Defendant AMAR S. DOMAN is the Chief Executive Officer for Defendant California Cascade Building Materials, according to the documents on file with the Secretary of State.

18.    EDEN is informed and believes, and on such information and belief alleges that Defendant JAMES COLE is the Chief Financial Officer for Defendant California Cascade Building Materials, according to the documents on file with the Secretary of State.

19.    EDEN is informed and believes, and on such information and belief alleges that Defendant JACOB BURNS is the Manager of and the Legally Responsible Person for the Facility according to the documents on file with the Regional Water Board.

**STATUTORY BACKGROUND**

20.    Congress declared that the CWA was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

21.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not

authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

22.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

23.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

24.    The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

25.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

FIRST AMENDED COMPLAINT – Page 7

26.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

27.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

28.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

29.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the

quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

30.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

31.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I(1).

32.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

33.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as

necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

34. The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. General Permit, § X(H)(4), (5).

35. The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

36. As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

37. Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

38. A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. General Permit §XI(B)(2)

39. Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of

FIRST AMENDED COMPLAINT – Page 10

collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit § XI(B)(4)

40.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A)

41.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

42.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

43.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

44.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

45.    An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

46.    When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit § XII(C)

47.    For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit §XII(D)

48.    Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

49.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified

FIRST AMENDED COMPLAINT – Page 12

personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

50.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See* also Clean Water Act Section 309(c)(4).

Central Valley Region Basin Plan

51.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

52.     The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating, . . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

FIRST AMENDED COMPLAINT – Page 13

53.     The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

54.     The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

55.     The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

56.     The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

57.     The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

58.     The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

59.     The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

**Citizen Suit Provision of the CWA**

60.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. § 1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

61.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

62.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4. On information and belief, Defendant California Cascade Building Materials is not a current permittee under the General Permit. However, the allegations set forth herein concerning California Cascade Building Materials'

violations of the General Permit during the period when it was a permittee constitute a history of past violations of the General Permit, relevant to an award of civil penalties under the CWA, 33 U.S.C. §§ 1319(d).

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

63.     The Facility is a twenty (20) acre wood products manufacturing and distribution plant with on-site equipment utilized for re-sawing, planing, treating, molding and kiln drying of the logs, poles, beams and raw lumber delivered to the Facility, including Douglas fir, Hem fir, Cedar, Whitewood, Redwood and plywood.

64.     The Facility saws, cuts, trims, planes, molds and treats the raw wood and timber into wood products it sells to retail lumber companies and businesses such as Home Depot. According to the SWPPP filed previously by California Cascade Building Materials: "Specific activities that occur at this facility include lumber receiving, processing, storage, and shipping. Sawn lumber is received by truck or train, processed (resawn, manufactured into various wood products, inventoried, labeled, and/or repackaged), stored in sheds or on open, asphalt, concrete, or gravel surfaced lots, and reshipped by truck or train." In other words, at the Facility, Defendant California Cascade Building Materials takes in sawn lumber boards, then cuts, mills and planes them into various end products, including fencing material (such as fence posts, pickets, and panels), and wooden stakes, and then sells those products to its customers. The finished materials Defendant California Cascade Building Materials produces on-site for wholesale distribution include pressure treated lumber and plywood (NatureWood ACQ and Advance Guard Borate), Redwood, Cedar and Composite Decking; Fencing (fence panels, pickets, posts and rails); Redwood and Cedar siding; and finishing and landscaping products such as Garden Postcaps, Benderboard, Lattice, Fascia/Trim and Stakes.

65.     These wooden products manufacturing activities are covered under Standard Industrial Classification Codes (SIC) 2421 (General Sawmills and Planing Mills), 2431 (Millwork, Plywood and Wood Planing), 2491 (Wood Preserving), 2499 (Wood Products, Not Elsewhere Classified), and 5031 (Wholesale Distribution of Lumber). The preamble to SIC Code Division 24 (which governs the aforementioned SIC Codes) states: "The manufacturing division includes establishments engaged in the mechanical or chemical transformation of materials or substances into new products. These establishments are usually described as plants, factories, or mills and characteristically use power driven machines and materials handling equipment." As relevant here, the Facility uses "mechanical" means (*i.e.*, sawing and planing) to "transform" "materials" (*i.e.*, sawn lumber) into "new products" (*i.e.*, various wood products, including fencing materials and stakes). Because the Facility causes the mechanical transformation of materials into new products, it meets the definition of a "manufacturing" facility under the SIC manual. In addition, as noted in the preamble to SIC Code Division 24, manufacturing facilities are often described as "mills." All three annual reports filed by Defendant over the last three years are signed by Jacob Burns with the designation "Mill Manager."

66.     In addition, California Cascade Building Materials operates an interstate trucking operation (with numerous trucks and drivers) which transports logs, poles, beams, lumber and building materials, and is licensed under U.S. Department of Transportation ("USDOT"), Federal Motor Carrier Safety Administration Carrier No. 2786835, and provides on-site maintenance and repair for its trucks. According to information filed by California Cascade Building Materials with the USDOT on October 15, 2019 under Form MCS-150, the Operation Classification for this trucking operation is (1) "Authorized-For-Hire," which means "A commercial motor carrier whose primary business activity is the transportation of

property/passengers by motor vehicle for compensation."; and (2) "Private (property)," which means "A motor carrier whose highway transportation activities are incidental to, and in furtherance of, its primary business activity." In addition, according to California Cascade Building Materials' Form MCS-150, this trucking operation involves the use of sixteen (16) truck drivers, it is an interstate trucking operation, and the trucks travelled a total of 754,156 miles in 2018. These interstate trucking activities are covered by SIC Code 4213 (Trucking, except local).

67.    The Facility SIC Codes of 2421, 2431, 2491, 2499, and 4213 are among the SIC Codes that require General Permit coverage.

68.    The Fact Sheet accompanying the General Permit discusses how to classify a facility when multiple different activities are occurring there. It relies on the 1987 SIC Manual, which accompanied the publication of the SIC Codes, and says:

> This General Permit provides regulatory coverage for all facilities with industrial activities described in Attachment A where the covered industrial activity is the Discharger's primary industrial activity. *In some instances, a Discharger may have more than one primary industrial activity occurring at a facility*.
>
> The 1987 SIC manual uses the term "establishment" to determine the primary economic activity of a facility. The manual instructs that *where distinct and separate economic activities are performed at a single location, each activity should be treated as a separate establishment (and, therefore, separate primary activity)*. For example, the United States Navy (primary SIC code 9711) may conduct industrial activities subject to permitting under this General Permit, such as landfill operations (SIC code 4953), ship and boat building and repair (SIC code 3731, and flying field operations (SIC code 4581).

Fact Sheet at 9 (emphasis added).

69.     This language makes clear that each "distinct and separate economic activity" within a facility is treated as a separate "primary activity." Under the SIC Manual, SIC Codes are assigned based on the "primary activity" at a facility. Therefore, the Fact Sheet makes clear that a given facility can have multiple SIC Codes, each of which applies to each distinct and separate economic activity at the facility. This is demonstrated by the example of a Navy base provided in the Fact Sheet. Although the activity of the Navy as a whole is classified as within SIC Code 9711 ("Establishments of the armed forces, including the National Guard, primarily engaged in national security and related activities."), separate portions of a Naval base may be separately classified, if the Navy conducts "discrete and separate economic activity" in such areas (e.g., landfill operations, ship building, and airfield operations).

70.     As noted above, California Cascade Building Materials conducts wood products manufacturing activities that are the same type of activity would occur at any other similar wood products manufacturing facility, namely, receiving source materials in the form of sawn lumber, using mechanical means like sawing, milling and planning, to transform that material into various finished wood products, such as fencing materials and wood stakes, which are then sold to third parties. This constitutes a distinct and separate economic activity occurring at the Facility, which constitutes a separate "primary activity" occurring there. As such, the Division 24 SIC Codes apply to the Facility, regardless of whether any other SIC Codes may also apply.

71.     Additionally, the Facility operates an interstate trucking operation available to be hired by third parties, which uses sixteen (16) drivers that collectively travelled three quarters of a million miles in 2018. This is the same type of activity as would be occurring at a separate, standalone interstate trucking company. This constitutes a distinct and separate economic activity occurring at the Facility, which constitutes a separate "primary activity" occurring there. As

such, SIC Code 4213 applies to the Facility, regardless of whether any other SIC Codes may also apply.

72.     Based on the EPA's Industrial Storm Water Fact Sheet for Sector A –Wood and Timber Products, polluted discharges from operations at the Facility contain bark and wood debris, toxic metals, such as lead, cadmium, arsenic and copper; total suspended solids ("TSS"); chemical oxygen demand (COD; biochemical oxygen demand (BOD); diesel; fuel; solvents; and oil and grease ("O&G"). Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.

73.     EDEN is informed and believes that California Cascade Building Materials stores vast amounts of industrial materials outdoors, including finished pressure-treated lumber.  The industrial materials stored by the facility are exposed to storm water, and can be eroded by wind, and otherwise contaminate the surrounding watershed with toxic pollutants such as arsenic, boron, zinc, ammonia, cadmium and copper.

74.     Based on EDEN's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and EDEN's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least five outfalls.  The outfalls discharge storm water and pollutants contained in that storm water into the municipal separate storm sewer system, which discharges to Morrison Creek, and then the Sacramento River. Both Morrison Creek and the Sacramento River are navigable waters of the United States.

75.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne

FIRST AMENDED COMPLAINT – Page 20

materials associated with the industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, wood chips, oil & grease, and toxic chemicals such as arsenic, boron, ammonia and copper, as it flows towards the storm water channels.

76.     On information and belief, Plaintiff alleges that there are no structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

### Operating Without NPDES Coverage

77.     Defendant California Cascade Building Materials began its operations at the Facility on or about July 14, 2015.  The facility operated under prior ownership at the site in the name of California Cascade Industries, between July 19, 2007 and July 1, 2015.

78.     Defendants obtained coverage under the General Permit on July 7, 2015. However, on August 1, 2019, Defendants filed paperwork with the State Water Board terminating their General Permit coverage. California Cascade Building Materials had previously taken the position that SIC Code 2499 applied to the Facility, and on that basis had sought and obtained coverage under the General Permit. However, in its request to terminate General Permit coverage, California Cascade Building Materials changed its position as to which SIC Code applied to the Facility. Instead of SIC Code 2499, California Cascade Building Materials took the position that the appropriate SIC Code is SIC Code 5031 (warehousing and wholesale distribution of lumber and construction building materials), which is not one of the SIC Codes

that requires General Permit coverage. On that basis, California Cascade Building Materials terminated its General Permit coverage effective on September 17, 2019.

79.     Plaintiff contends that the California Cascade Building Materials' facility incorporates at least three distinct and separate economic activities at the site located at 7512 14th Avenue in Sacramento, California.  At least two of the separate economic activities require Defendants to maintain NPDES coverage under the General Permit.

80.     Specifically, facility operations include (a) warehousing and wholesale distribution of lumber and construction building materials, which fall under SIC Code 5031; (b) wood products manufacturing, which fall under SIC Codes 2421, 2431, 2491, and 2499; and (c) local trucking operations with on-site maintenance and fueling, which fall under SIC Codes 4213 and 7538.  The operations delineated in (b) and (c) are among the industrial operations which require a facility to obtain and maintain NPDES Permit coverage under the General Permit.

81.     Defendants have failed to date to re-apply for NPDES coverage under the General Permit for the Facility since terminating Permit coverage and are currently discharging storm water into Morrison Creek and the Sacramento River from the Facility without a Permit, in violation of the CWA.

82.     On information and belief Defendant California Cascade Building Materials is not a current permittee under the General Permit. However, if California Cascade Building Materials is a current permittee under the General Permit, or becomes one, then EDEN asserts the following claims, as set forth in paragraph 83 to 110, 119 to 121.

**Deficient SWPPP/Failure to Follow SWPPP**

83.     On information and belief, Plaintiff alleges that since at least July 6, 2015, Defendant has failed to implement an adequate SWPPP for the Facility.

84.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's SWPPP does not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT for the Facility.

85.     Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Sections X(A), X(F), X(G), XI(B)(6), XII(K) and X(D) of the General Permit.

86.     According to information available to EDEN, Defendants' SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

87.     Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section X of the General Permit.

88.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed and continue to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

89.     In addition, Plaintiff alleges that Defendants have failed to comply with the provisions of the Facility's current SWPPP in the areas of monitoring and reporting.

90.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the American Morrison Creek and the Sacramento Rivers, including the pollutants of arsenic, copper, zinc, COD, Diesel Fuel, Motor Oil, Waste Oil, Grease and Ethylene Glycol.

91.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued

discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

Monitoring and Reporting

92.     On information and belief, EDEN alleges that Defendants have an inadequate monitoring program at the California Cascade Building Materials Facility.

93.     On information and belief, EDEN alleges that during the 2015-2016 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

94.     On information and belief, EDEN alleges that during the 2016-2017 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

95.     On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

96.     On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year.

97.     On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Facility since at least July 6, 2015.

98.     On information and belief, EDEN alleges that Defendants have failed to collect storm water samples from each drainage area at all discharge locations for each QSE where sampling is performed, pursuant to General Permit § XI.B.  Pursuant to California Cascade Building Materials' SWPPP for its Facility, it has five sampling locations.  None of the storm

water samples that Defendants have collected and analyzed to date have contained sampling for all discharge/sampling locations.

99.	EDEN is informed and believes that Defendants have failed to analyze the Facility's storm water samples for the required parameters, in violation of Section XI(B)(6) of the General Permit.  Specifically, Section XI(B)(6)(d) of the General Permit requires additional sampling parameters of Arsenic, Copper, Zinc and Chemical Oxygen Demand (COD), which are required based on the Facility's SIC codes of 2421, 2431, and 2491 and 2499.  Since at least July 6, 2015, Defendants have failed to sample for the required analytical parameters of Arsenic, Copper, Zinc and Chemical Oxygen Demand (COD).

100.	EDEN is informed and believes that Defendants have failed to upload Facility storm water sample analyses within 30 days of obtaining the result for the sampling event, in violation of Section XI(B)(11) of the General Permit.  Specifically, Defendants failed to upload into SMARTS within 30 days the sample analyses for storm water samples collected on December 15, 2016 and November 29, 2018.

Falsification of Annual Reports

101.	EDEN is informed and believes that Defendants have submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit.

102.	Specifically, on September 21, 2017, California Cascade Building Materials submitted its Annual Report for the Fiscal Year 2016-2017.  The Report was signed under penalty of law by Defendant Jacob Burns, who is the designated Legally Responsible Person ("LRP") for Defendant California Cascade Building Materials.

103.    Defendant Jacob Burns responded "Yes" to Question No. 3 on the Annual Report ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?")  However, in fact Defendant California Cascade Building Materials failed to collect and analyze the required number of storm water samples during the 2016-17 reporting year, having only collected and analyzed one storm water sample on December 15, 2016, and that sample did not include sampling from all five outfalls at the Facility.

104.    On May 3, 2019, Defendant Jacob Burns uploaded a revised Annual Report for the 2016-17 Reporting Year which amended the Facility's response to Question No. 3 from "Yes" to "No", indicating as a reason: "Due to staffing changes, it is unknown if the facility completed the requirements of the General Permit, Conditions XI.A.1, XI.A2, XI.B, and XX.I.J.3." However, this response is also false.

105.    Defendant Jacob Burns originally stated, under penalty of perjury, that the Facility had collected and analyzed the required number of storm water samples. Mr. Burns has continuously been the Facility Manager since at least August 1, 2015; and the Facility's current SWPPP indicates that the Facility Manager is the primary Pollution Prevention Team Member responsible for implementing the requirements of the General Permit. Thus, it would have been known to Mr. Burns whether or not the Facility had collected and analyzed the required number of storm water samples during the reporting year.

106.    On May 3, 2019, the Facility uploaded to SMARTS Revised Annual Reports for the Reporting Years 2015-16 and 2017-18; and on July 12, 2019, the Facility uploaded its Annual Report for the Reporting Year 2018-19. All three reports were signed by Defendant Jacob Burns as the Mill Manager, and all three Annual Reports indicated that the Facility had not

FIRST AMENDED COMPLAINT – Page 26

collected and analyzed the required number of storm water samples during each of the Reporting Years because there had not been enough rainfall or Qualifying Storm Events (QSEs) in the area during the years to produce sufficient discharge.

107.   However, Records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years 2015-16 and 2017-18, there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendant California Cascade Building Materials to collect the requisite number of samples.

108.   Based on the foregoing, it is clear that Defendant Jacob Burns intentionally made false statements in the Facility's 2015-16, 2016-17 and 2017-18 Annual Reports when he indicated that the Facility had collected samples according to Section XI.B of the General Permit during the reporting years when in fact the Facility did not collect the required number of samples at all outfalls and when he stated that there were insufficient QSEs during the reporting years to collect the samples.

Failure to Implement BAT/BCT and BMPs

109.   EDEN is informed and believes that Defendant California Cascade Building Materials has failed to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

110.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to Morrison Creek and the Sacramento and American Rivers.

**Discharges of Contaminated Storm Water to Waters of the United States**

111.    Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate best management practice ("BMP") development and/or implementation necessary to prevent these discharges.

112.    Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendants are discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event (*i.e.*, all rainfall events generating 0.1 inches or more of rain).  These pollutants include oil & grease, total suspended solids, COD, ammonia, boron, copper and other potentially unmonitored pollutants. These pollutants are discharged to waters of the United States, including Morrison Creek and the Sacramento River.

113.    The Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan. These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the General Permit; and are evidence of ongoing violations of Effluent Limitation V(A) of the Permit.

114.    The Facility has reported violations of the narrative water quality standards for discoloration, turbidity, and suspended solids contained in the Basin Plan. Specific dates on

which Defendant has observed storm water discharges with at least one of such violations include December 15, 2016; November 29, 2018; and May 15, 2019.

115. Specifically, the levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively, and the instantaneous NAL value for TSS of 400 mg/L established by the State Board.

116. For example, on December 15, 2016, the TSS level at the facility was measured at 218 mg/L. That level is twice times the benchmark value and annual NAL for TSS.   Defendant also has measured levels of TSS in excess of 100 mg/L in storm water discharged from the Facility on November 29, 2018; and May 16, 2019.

117. Furthermore, the levels of Oil & Grease in storm water detected by the Facility have exceeded the benchmark value and annual NAL for 15 mg/L established by EPA and the State Board, respectively, and the instantaneous NAL value of 25 mg/L established by the State Board.

118. For example, on November 29, 2018, the Oil & Grease level at the facility was measured at 1070 mg/L. That level is more than seventy-one (71) times the benchmark value and annual NAL for TSS.   Defendant also has measured levels of Oil & Grease in excess of 15 mg/L in storm water discharged from the Facility on May 16, 2019.

Failure to Train Employees

119. The General Permit require all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the

following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

120.    Defendants have failed to implement adequate BMPs at the Facility, have not conducted monthly visual observations, and have failed to comply with required storm water sampling and analysis.

121.    Based on the foregoing, Plaintiff alleges that Defendants have not adequately trained Defendant California Cascade Building Materials' Pollution Prevention Team, in violation of Sections X(D)(1) and X(H)(f) of the General Permit.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

122.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

123.    On information and belief, Defendant California Cascade Building Materials is not a current permittee under the General Permit. However, if California Cascade Building Materials is a current permittee under the General Permit, or becomes one, then EDEN asserts the following claim:

124.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

125.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Facility.

126.    Each day since July 6, 2015, that Defendants failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of Section X of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

127.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

128.    On information and belief, Defendant California Cascade Building Materials is not a current permittee under the General Permit. However, if California Cascade Building Materials is a current permittee under the General Permit, or becomes one, then EDEN asserts the following claim:

129.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

130.    As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility.

131.    Defendant California Cascade Building Materials' ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

132.    Each day since at least July 6, 2015, that Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of Section XI of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

133.    Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit § XXI(A); 33 U.S.C. § 1342.

FIRST AMENDED COMPLAINT – Page 31

## THIRD CAUSE OF ACTION
### Submission of False Annual Reports to the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

134. Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

135. On information and belief, Defendant California Cascade Building Materials is not a current permittee under the General Permit. However, if California Cascade Building Materials is a current permittee under the General Permit, or becomes one, then EDEN asserts the following claim:

136. Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L) which provides significant penalties for submitting false information.

137. Specifically, Clean Water Action section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty to any person who knowingly makes a false material statement, representation or certification in any record or other documents submitted or required to be maintained under the General Permit, including Annual Reports, up to and including a fine of $10,000 and imprisonment of two years, or both.

138. As delineated herein, Defendant California Cascade Building Materials' Legally Responsible Person Defendant Jacob Burns made false representations in the Facility's Annual Reports for the reporting periods 2015-16, 2016-17 and 2017-18.

139. At the time that Defendant Jacob Burns made the false representations referred to above, he knew or should have known that the representations were false but proceeded nonetheless to certify under penalty of law to the Regional Water Board that the information contained in the Annual Reports was true and correct.

FIRST AMENDED COMPLAINT – Page 32

140.    Each time that Defendants have submitted false statements to the Regional Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

141.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

142.    On information and belief, Defendant California Cascade Building Materials is not a current permittee under the General Permit. However, if California Cascade Building Materials is a current permittee under the General Permit, or becomes one, then EDEN asserts the following claim:

143.    The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

144.    Defendants failed to implement BAT and BCT at the Facility for its discharges of Oil & Grease, Total Suspended Solids, Zinc, Arsenic, COD, Copper, and other potentially un-monitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

145.    Each day since at least July 6, 2015, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

146. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

147. On information and belief, Defendant California Cascade Building Materials is not a current permittee under the General Permit. However, if California Cascade Building Materials is a current permittee under the General Permit, or becomes one, then EDEN asserts the following claim:

148. Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

149. Plaintiff is informed and believes, and thereupon alleges, that since at least July 6, 2015, Defendant California Cascade Building Materials has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

150. During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with iron, sediment, zinc, nitrates, phosphorus and other potentially un-monitored pollutants at levels above

FIRST AMENDED COMPLAINT – Page 34

applicable water quality standards. The storm water then flows untreated into Morrison Creek and the American and Sacramento Rivers.

151. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

152. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

153. Every day since at least July 6, 2015, that Defendant California Cascade Building Materials has discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. These violations are ongoing and continuous.

**SIXTH CAUSE OF ACTION**
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

154. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

155. On information and belief, Defendant California Cascade Building Materials is not a current permittee under the General Permit. However, if California Cascade Building Materials is a current permittee under the General Permit, or becomes one, then EDEN asserts the following claim:

156. Section X(D)(1) of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the

requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

157. Section X(H)(f) of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

158. Since at least July 6, 2015, Defendants have failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

## SEVENTH CAUSE OF ACTION
**(Discharge of Contaminated Storm Water Without NPDES Authorization in Violation of the Act, 33 U.S.C. §§ 1311(a))**

159. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

160. CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless authorized by the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

161. On information and belief, Defendant California Cascade Building Materials does not have NPDES permit authorization for storm water discharges from the Facility into waters of the United States.

FIRST AMENDED COMPLAINT – Page 36

162.    Since September 17, 2019, California Cascade Building Materials has been discharging polluted storm water from the Facility without NPDES permit authorization during every significant rain event (i.e., all rainfall events generating 0.1 inches or more of rain) in violation of CWA section 301(a), 33 U.S.C. § 1311(a). In particular, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with iron, sediment, zinc, nitrates, phosphorus and other potentially un-monitored pollutants. The storm water then flows untreated into Morrison Creek and the Sacramento River.

163.    Defendant California Cascade Building Materials will continue to be in violation of CWA section 301(a)'s discharge prohibition each day it discharges storm water from the Facilities without obtaining an NPDES permit.

164.    Each day since September 17, 2019 that California Cascade Building Materials has discharged pollutants in storm water without an NPDES permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

165.    By committing the acts and omissions alleged above, California Cascade Building Materials is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

166.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm plaintiff and plaintiff's members, for which harm they have no plain, speedy or adequate remedy at law.

FIRST AMENDED COMPLAINT – Page 37

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.      Declare Defendants to have violated and to be in violation of the CWA;

2.      Issue an injunction either (1) if Defendant California Cascade Building Materials is not a current permittee under the General Permit, ordering Defendants to immediately apply for and secure NPDES authorization under the General Permit or an individual NPDES permit for the Facility, or (2) in the alternative, if Defendant California Cascade Building Materials is a current permittee under the General Permit, ordering Defendants to operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.      Enjoin Defendants from discharging pollutants from the Facility either (1) if Defendant California Cascade Building Materials is not a current permittee under the General Permit, until such time as it has obtained NPDES authorization under the General Permit or an individual NPDES permit for the Facility, or (2) in the alternative, if California Cascade Building Materials is a current permittee under the General Permit, until such time as it has developed and implemented an adequate SWPPP, implemented appropriate BMPs and a proper monitoring implementation plan;

4.      Enjoin Defendant from violating the substantive and procedural requirements of the Clean Water Act and the General Permit;

5.      Order Defendants to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

6.      Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at the Facility;

7.      Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as required by law; and

8.      Award such other and further relief as may be just and proper.

Dated: December 18, 2019                              Respectfully,


By: ___*/s/ Christopher Sproul*_____
        Christopher Sproul
        Attorney for Plaintiff